## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Lennell M. Martin,                                      Civ. No. 08-22 (PAM/JJK)

      Petitioner,

    v.                                              **REPORT AND**
                                     **RECOMMENDATION**

Joan Fabian, Commissioner of
Corrections; and Robert Fanies,
Warden of MCF-Rush City;

      Respondents.

---

Lennell M. Martin, Minnesota Correctional Facility - Rush City, 7600 525th Street, Rush City, Minnesota, 55069, Petitioner, *pro se*.

Marcy S. Crain, Assistant Anoka County Attorney, counsel for Respondents.

---

JEFFREY J. KEYES, United States Magistrate Judge

     This matter is before the undersigned Magistrate Judge of the District Court on the petition of Lennell M. Martin for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Respondents have filed a response contending that the petition should be dismissed (Doc. No. 11), and Petitioner has completed the briefing in this matter by filing a 53-page "Memorandum In Support Of Petition For Habeas Corpus."  (Doc. No. 17.)

     The case has been referred to this Court for Report and Recommendation under 28 U.S.C. § 636 and Local Rule 72.1.  For the reasons discussed below, this Court recommends that Petitioner's habeas corpus petition be **DENIED**, and

that this action be **DISMISSED WITH PREJUDICE**.

## I. FACTUAL BACKGROUND[1]

During the early morning hours of November 3, 2002, a woman named

Precious Franklin was sleeping in her apartment in Fridley, Minnesota.  At

approximately 4:30 a.m., Franklin woke up, checked on her young son who was

still sleeping, and went to the kitchen.  When Franklin arrived in the kitchen, she

found two men she had never seen before.  One man was armed with a long

gun, and the other had a knife.  Franklin screamed, quickly left the kitchen, and

returned to her bedroom, where her boyfriend, Curtis Anthony, was still in bed.

The two armed men followed Franklin into the bedroom, and Franklin's

young son came into the room as well.  The man with the gun escorted Franklin

and her son to an adjacent bathroom, and the door was closed.  Franklin could

hear Anthony and the two intruders in the bedroom, and she heard Anthony

making noises that made her think he was being hurt.

---

[1]     The elemental facts of this case have previously been reported in several places, including the Minnesota Supreme Court's opinions in appeals that have been pursued by Petitioner and his alleged accomplice.  *See State of Minnesota v. Martin*, 695 N.W.2d 578 (Minn. 2005); *State of Minnesota v. Young*, 710 N.W.2d 272 (Minn. 2006).  The facts have also been reported in a Report and Recommendation, and in an ensuing Order, in the accomplice's recently concluded habeas corpus action in this District.  *Young v. Symmes*, Civil No. 06-4246 (JRT/JJG).  This Court's recitation of the facts is consistent with all of the prior renditions, but it is based most directly on the "Statement of the Facts" section of Petitioner's Brief to the Minnesota Supreme Court on direct appeal, which is included in the present record as "Exhibit 9" of Respondents' Exhibits. (Doc. No. 11, Ex. 9.)

A man in a neighboring apartment had heard Franklin scream, and he then heard fighting noises coming from Franklin's apartment. He got up to investigate, and saw a green Cadillac parked outside the apartment building, with its engine running. The neighbor approached Franklin's apartment, and knocked on the door, hoping to find out about the noises he had been hearing. Immediately after the neighbor knocked on the door, he heard a loud noise, which sounded like a gunshot. The neighbor then ran back to his own apartment to call 911.

While Franklin was still in the bathroom, she heard the neighbor knock on the apartment door, and she then heard the gunshot noise. She heard the intruders run from her apartment, and then heard Anthony standing outside the bathroom door, calling her name. When she opened the door, Anthony was standing there clutching his chest, and bleeding profusely. He was crying and obviously in great pain, and Franklin heard him say, "Call the police. Jeff and Lenair."

Franklin tried to call 911, but her phone was not working, so she ran to the neighbor's apartment. When she arrived, the neighbor was already on the phone talking to a 911 operator, and asking for help. The neighbor told the 911 operator to send the police and an ambulance as quickly as possible. The 911 operator was seeking information from the neighbor about what had happened, and Franklin told the neighbor that Anthony had said "Jeff and Lenair."[2]

_____

[2]     A recording of the 911 call was played to the jury during Petitioner's
(Footnote Continued on Next Page)

Franklin left her son in the neighbor's apartment, and then she and the neighbor returned to her own apartment, where they found Anthony bleeding and struggling to stay alive. Although Anthony was still conscious, he was having a hard time breathing, and he was unable to speak intelligibly. The police arrived moments later, and tried to keep Anthony alive. One of the police officers became covered with Anthony's blood, as he tried to stop the bleeding from Anthony's chest. However, Anthony lost consciousness shortly after the police entered the apartment. He was taken to the hospital by ambulance, and died soon after he arrived there.

At some point that same morning, Franklin talked to Anthony's sister by telephone, and told her what had happened, including Anthony's final words. Anthony's sister told Franklin that Anthony's former girlfriend, Monique Frye, had two cousins named Jeff Young and Lennell Martin (the latter being the current Petitioner). When Franklin heard the names "Jeff" and "Lennell," she understood that those were the names that Anthony had spoken as he was dying.[3]

_____

(Footnote Continued from Previous Page)
subsequent trial, and a transcript of that recording is included in the present record at Exhibit 4 of Respondents' Exhibits. (Doc. No. 11, Ex. 4 at 1840-46.) The transcript provides a sense of the terror that Franklin and the neighbor must have felt, and it shows Franklin reporting the words "Jeff and Lenair" just a few moments after she had heard those words uttered by Anthony.

[3]     The Court recognizes that there has always been (and continues to be), some dispute about what Anthony said, what Franklin heard, and what Franklin later told others. (Was it "Lennair," "Lennell," "Lenny," or some other similar name?) That dispute presented an issue to be resolved by the jury at Petitioner's
(Footnote Continued on Next Page)

Later that day, the police interviewed Monique Frye, Anthony's former girlfriend and the mother of his daughter, and learned that Petitioner, Lennell Martin, drove a green Cadillac.  The Cadillac was located and searched, and several blood stains were found in various places on the inside of the car, including on a headline knob, the dashboard, and the steering wheel cover.  DNA testing showed that the blood came from Anthony.  Sometime later, the police found papers in Jeff Young's car that provided directions to Franklin's apartment.

During the afternoon of the day on which Anthony was murdered, the police showed Franklin a photo lineup, which included a picture of Petitioner. Franklin identified Petitioner as one of the men she had seen in her apartment earlier that day.  Franklin said that Petitioner was the man who carried the gun, and took her into the bathroom.  (During Petitioner's subsequent trial, Franklin again identified Petitioner as the gunman.)  The day after Anthony was killed, Franklin looked at a second photo lineup, and this time she identified Jeff Young as the other man she had seen in her apartment.

Petitioner and Jeff Young were apprehended.  They admitted that they had been together during the evening before Anthony was murdered, but they denied

_____

(Footnote Continued from Previous Page)
trial, and it is *not* an issue that can properly be revisited in the current federal habeas corpus action.  For present purposes, this Court will refer to the statement at issue in this case as "Jeff and Lennell"—which is what the jury apparently believed Anthony said—while acknowledging that Petitioner does not accept Franklin's explanation of what she heard Anthony say.

being the men who killed Anthony.  Petitioner, however, was later indicted by a grand jury for first degree premeditated murder and first degree felony murder. He was subsequently charged by criminal complaint with two counts of second degree assault with a dangerous weapon, and two counts of kidnapping.

At the conclusion of a jury trial in Anoka County, Minnesota, Petitioner was found guilty on all of the charges against him, except for one of the two assault charges.  He was sentenced to life in prison, and he is presently serving his sentence at the Minnesota Correctional Facility in Rush City, Minnesota.[4]

## II.  PETITIONER'S DIRECT APPEAL

After Petitioner was convicted and sentenced, he filed a direct appeal in the Minnesota Supreme Court.[5]  His appellate counsel filed a brief that raised two claims: (1) that Franklin should not have been allowed to testify about Anthony's reference to "Jeff and Lennell" just before he died; and (2) that the trial court judge should not have communicated with the jury during deliberations without Petitioner being present.  Petitioner also filed a separate *pro se* brief, in

---

[4]     Petitioner's accomplice, Jeffery Young, was also charged and convicted in connection with Anthony's murder, and he is also serving a life sentence.  *See State of Minnesota v. Young*, 710 N.W.2d 272 (Minn. 2006); *Young v. Symmes*, Civil No. 06-4246 (JRT/JJG), 2008 WL 4748569 (D. Minn. Oct. 28, 2008).

[5]     Under Minnesota law, appeals in first degree murder cases are taken directly to the State Supreme Court, rather than the Minnesota Court of Appeals. Minn. Stat. § 632.14.

which he raised several additional claims.[6]

The Minnesota Supreme Court found that Petitioner's first claim, involving Anthony's dying reference to "Jeff and Lennell," had not been properly preserved for appellate review, because Petitioner had not objected to that evidence during his trial.  However, the Court noted that this claim could be reviewed if there were "plain error affecting substantial rights."  *State of Minnesota v. Martin*, 695 N.W.2d 578, 582-83 (Minn. 2005) (hereafter "*Martin I*").  The Court then proceeded to consider the claim on the merits.

The Minnesota Supreme Court initially determined that Anthony's reference to Jeff and Lennell was a "dying declaration," which is admissible under the Minnesota Rules of Evidence, as an exception to the general ban against hearsay evidence.  *Id.* at 583-84 ("Considering the circumstances surrounding Anthony's statement, [*i.e.*, 'Jeff and Lennell'], it is evident that this statement qualifies as a dying declaration, admissible as a hearsay exception under Minn. R. Evid. 804(b)(2).").  The Court then considered whether the admission of Anthony's dying declaration violated Petitioner's federal constitutional rights under the Sixth Amendment's "Confrontation Clause."

The State Court's analysis of Petitioner's Sixth Amendment claim was guided by the United States Supreme Court's decision in *Crawford v. Washington*, 541 U.S. 36 (2004).  In *Crawford*, the Court held that "testimonial

---

[6]     Petitioner's *pro se* brief to the Minnesota Supreme Court is included in the
(Footnote Continued on Next Page)

statements" of a witness who does not appear at a criminal trial are barred by the Sixth Amendment, unless the witness is not available to testify, and the defendant had a prior opportunity to cross-examine the witness. *Id.* at 53-54.  On Petitioner's appeal to the Minnesota Supreme Court, he argued that Anthony's dying declaration ("Jeff and Lennell"), was a "testimonial statement" that was barred by *Crawford*, because Anthony had never been subject to cross-examination.  The prosecution argued that Anthony's dying declaration was *not* a "testimonial statement" and it was therefore *not* barred by *Crawford*, but rather, it was admissible under pre-*Crawford* Sixth Amendment case law – most notably *Ohio v. Roberts*, 448 U.S. 56, 66 (1980).

The Minnesota Supreme Court, however, found that it was not necessary to decide whether Anthony's dying declaration was or was not "testimonial," because, in any event, "the Sixth Amendment incorporates an exception for dying declarations and Anthony's dying declaration was admissible as an exception to the *Crawford* rule."  *Martin I*, 695 N.W.2d at 585.  The Court held that "the admission into evidence of a dying declaration does not violate a defendant's Sixth Amendment right to confrontation within the meaning of *Crawford* because an exception for dying declarations existed at common law and was not repudiated by the Sixth Amendment."  *Id.* at 585-86.

The Court then turned to the second claim raised on direct appeal – *i.e.*,

_____

(Footnote Continued from Previous Page)
current record as Exhibit 10 of Respondents' Exhibits.  (Doc. No. 11, Ex. 10.)

"whether it was reversible error for the trial court judge to have four different communications with the jury that occurred without [Petitioner's] presence, knowledge, or consent." *Id.* at 586.  The Court first acknowledged that the right of a criminal defendant to be present at various stages of his case is "broader under the Minnesota Rules of Criminal Procedure than is required by the United States Constitution." *Id.* "'[T]he general rule *in Minnesota* is that a trial judge should have no communication with the jury after deliberations begin unless that communication is in open court and defendant is present.'" *Id.* (quoting *Ford v. State*, 690 N.W.2d 706, 712 (Minn. 2005) (emphasis added)).  Even under Minnesota law, however, "'when a judge communicates in writing with the jury about a housekeeping matter, the defendant's right to be present at trial is not violated.'" *Martin I*, 695 N.W.2d at 586-87 (quoting *Ford*, 690 N.W.2d at 713).

In Petitioner's case, the Supreme Court concluded that the existing record left "some doubt as to whether the four [jury] communications at issue relate to housekeeping matters or substantive matters." *Martin I*, 695 N.W.2d at 587.  Therefore, the case was remanded to the trial court (with jurisdiction being retained by the Supreme Court), "to make a record of the four communications at issue." *Id.*

At the conclusion of *Martin I*, the Minnesota Supreme Court also considered the claims that were raised in Petitioner's separate *pro se* brief.

Those claims were summarily rejected with little substantive discussion.  *Id.*[7]

On remand, a hearing was conducted before a new judge.  The original

trial judge testified that counsel for Petitioner and the State had entered into an

agreement about how jury questions would be handled.[8]  The attorneys agreed

that they should not be summoned to the courtroom every time the jury asked a

question, but only "if there's something of real substance."  Petitioner was

present when the attorneys put their agreement on the record, and he voiced no

objection.  The trial judge also explained, during the remand proceedings, that as

far as she was concerned none of the questions presented by the jury involved

substantive or disputable issues that required consultation with counsel under the

terms of the agreement.  *See State v. Martin*, 723 N.W.2d 613, 618 (Minn. 2006)

(hereafter "*Martin II*") (stating that the trial judge testified that "if the jury had

asked a question that was outside the terms of the agreement, she would have

called the attorneys").

After the initial remand proceedings, the Supreme Court sent the matter

back to the county court again, this time with instructions to conduct a "*Schwartz*

hearing," which is a post-trial proceeding during which jurors can be questioned

---

[7]    Petitioner raised a *pro se* claim of ineffective assistance of counsel, which the Supreme Court did not decide on the merits.  Instead, the Court required Petitioner to raise the claim in a post-conviction motion.  *Martin I*, 695 N.W.2d at 587-88.  That ruling is not at issue here, because Petitioner has not presented an ineffective assistance of counsel claim in his current petition.

[8]    A transcript of that agreement is included in the current record at Exhibit 2
(Footnote Continued on Next Page)

about events that arguably could have tainted their verdict.  *See Schwartz v. Minneapolis Suburban Bus Co.*, 258 Minn. 325, 104 N.W.2d 301 (1960).  All twelve of the original jurors testified at the *Schwartz* hearing.  At the conclusion of the hearing, the district court entered findings of fact, which described the evidence pertaining to the four judge-jury communications that were raised in Petitioner's appeal.  As described by the Minnesota Supreme Court:

> The evidence gathered during the remand proceedings provides the following information about the four communications:
>
> (1) On October 28, 2003, at 5:29 p.m., the jury asked a question which the judge answered at 5:30 p.m.  The written content of this communication was not located, but Davidson [the trial court's "in court deputy"] testified that the "question was to the Judge indicating or questioning what time [the jury] would have to leave for the hotel."  The deputy also recalled that the judge responded to this question at 5:30 p.m. telling the jury they would leave for the hotel at 8:00 p.m.
>
> (2) On October 28, at 8:18 p.m., the jury asked a question which the judge answered at 8:21 p.m.  The written content of this communication was not located and neither the deputy nor the trial judge could recall the content.
>
> (3) On October 29, at 9:58 a.m., the jury submitted a note to the judge asking "Can we have a dictionary?  If so give us one."  The judge's response, written on the note, is "No," followed by "Judge Olson 10:04 10/29/03[.]"
>
> (4) On October 29 at 10:08 a.m., the jury submitted a note to the judge asking "Does [the] rule of law define rash impulse?  What is it?"  The response, again written on the note, is, "You have the law the Judge has given you.  That is the only law that applies to this case[.]  Judge Olson 10:10 am 10/29/03[.]"

---

(Footnote Continued from Previous Page)
of Respondents' Exhibits.  (Doc. No. 11, Ex. 2.)

*Martin II*, 723 N.W.2d at 617.

When the case returned to the Minnesota Supreme Court, Petitioner renewed his contention that his conviction should be vacated because he "did not personally waive his right to be present" when the trial judge responded to the four jury communications at issue. *Id.* at 620. The Supreme Court rejected that argument, stating that:

> [Petitioner] provided no evidence that he wanted to be present if the district court received questions from the jury. There is no dispute that the court made an agreement with counsel regarding how to handle certain types of questions from the jury and that under the terms of that agreement [Petitioner] would not be present. There likewise is no dispute that this agreement was made in [Petitioner's] presence, and there is no evidence that [Petitioner] objected in any way to the agreement. It is certainly true that the court should have secured [Petitioner's] on-the-record acceptance of the agreement. But, in the context of a defendant's right to be present at trial, we have specifically found a waiver even though it was not expressed on the record.

*Id.* at 621.

The Minnesota Supreme Court ultimately determined that (1) Petitioner could waive his right to be present when the judge responded to questions from the jury; (2) Petitioner did, in fact, make such a waiver, by acquiescing to his attorney's agreement on jury communications; and (3) the trial judge acted in accordance with the agreement that Petitioner had accepted. Thus, the Court concluded in *Martin II* that "the district court did not violate Martin's right to be present at all stages of trial when the court communicated with the jury outside of

his presence." *Id.* at 625.

After the Minnesota Supreme Court finally upheld Petitioner's conviction and sentence in *Martin II*, Petitioner filed his current petition for federal habeas corpus review.  This petition presents the following claims:

(1) "Petitioner . . . was denied his constitutional rights to a fair trial and due process of law, when [the] trial court communicated several times with the deliberating jury outside the presence, knowledge, and consent of pet[itioner]." (Doc. No. 1, Petition ¶ 12.A.);

(2) "Hearsay [namely Anthony's dying declaration] was allowed in court and denied [Petitioner] of his constitutional rights to a fair trial and due process of law." (*Id.*, ¶ 12.B.);

(3) Petitioner was deprived of his constitutional right to a "fair and unprejudicial trial," because of alleged misconduct by the police.  He contends that the police (a) failed to preserve certain potentially relevant evidence, (b) failed to properly preserve the crime scene, and allowed unauthorized individuals to "come into the crime scene and consort or conspire with the only eye-witness without signing the crime scene log," and (c) used a misleading, unfair and biased photo lineup procedure.  (*Id.*, ¶ 12.C.); and

(4) Petitioner was deprived of his constitutional right to due process by reason of prosecutorial misconduct, because the prosecutor (a) used a criminal complaint to bring additional charges against Petitioner after he had been

indicted by a grand jury, (b) implied to the jury that Petitioner and other defense witnesses had been uncooperative and evasive during the police investigation, and (c) misled the jury about the meaning and significance of certain DNA and fingerprint evidence.  (*Id.*, ¶ 12.D.)[9]

Respondents acknowledge that there are no longer any state court remedies available for any of Petitioner's current claims for relief, but Respondents argue that some of Petitioner's claims have been procedurally defaulted, because they were not fairly presented to the Minnesota state courts. Although it is not entirely clear that all of Petitioner's current constitutional arguments were fully and fairly presented on direct appeal, the Court will give Petitioner the benefit of the doubt, and assume (for now) that all of his current claims were heard and decided by the Minnesota Supreme Court.  *See* 28 U.S.C. § 2254(b)(2) ("[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State"); *Trussell v. Bowersox*, 447 F.3d 588, 590 (8th Cir.) (confirming that procedural default is not a jurisdictional bar to review of

---

[9]   Petitioner has filed several documents in support of the four claims raised in his original petition, but he has expressly disavowed any attempt to add any new claims in those documents.  (*See* Doc. No. 22, Letter to the Court at (1) ("Relief should not be denied to the petitioner for raising new issues because the petitioner did not ask for relief by raising new issues or grounds.  The Petitioner only raised four issues and they are documented on the Habeas Corpus Petition[,] and the Memorandum to the petition only offers a more in-depth account of those issues.").)  All of Petitioner's submissions in support of the four claims raised in his petition have been duly considered by this Court.

a habeas claim, and addressing petitioner's apparently defaulted claim on the

merits "in the interest of judicial economy"), *cert. denied*, 127 S.Ct. 583 (2006).

Therefore, all of Petitioner's current claims will be addressed on the merits here.

For the reasons discussed below, this Court finds that Petitioner is not entitled to

any relief on any of his claims.

## III.  STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act, ("AEDPA"), prescribes

the standards that govern this Court's substantive review of Petitioner's habeas

corpus claims.  The relevant portion of AEDPA, 28 U.S.C. § 2254(d), provides

that:

> An application for a writ of habeas corpus on behalf of a person in
> custody pursuant to the judgment of a State court shall not be
> granted with respect to any claim that was adjudicated on the merits
> in State court proceedings unless the adjudication of the claim:
>
>> (1) resulted in a decision that was contrary to, or
>> involved an unreasonable application of, clearly
>> established Federal law, as determined by the Supreme
>> Court of the United States; or
>>
>> (2) resulted in a decision that was based on an
>> unreasonable determination of the facts in light of the
>> evidence presented in the State court proceeding.

In *Williams v. Taylor*, 529 U.S. 362 (2000), the United States Supreme

Court discussed the meaning of this statute, and how it should be applied by the

federal district courts.  The Supreme Court recognized that:

> a state-court decision can be "contrary to" this Court's clearly
> established precedent in two ways.  First, a state-court decision is
> contrary to this Court's precedent if the state court arrives at a

> conclusion opposite to that reached by this Court on a question of law.  Second, a state-court decision is also contrary to this Court's precedent if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours.

*Id.* at 405.

> Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.* at 413.

> The Court also explained that:

> A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was *objectively unreasonable* . . . [¶] [A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable.

*Id.* at 409, 411 (emphasis added).

A writ of habeas corpus may also be available where the state courts' resolution of a prisoner's criminal case is "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  In other words, habeas relief can be granted if the conviction is based on findings of fact that could not reasonably be derived from the state court evidentiary record.  When reviewing a state court decision, however, "a federal court . . . presumes that the state court's factual

determinations are correct," and that presumption "may be rebutted only by clear and convincing evidence." *Lee v. Gammon*, 222 F.3d 441, 442 (8th Cir. 2000); *see also* 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

Needless to say, a federal district court is not allowed to conduct its own *de novo* review of a prisoner's constitutional claims.  Habeas relief cannot be granted unless the prisoner has identified, and substantiated, a specific error committed by the state courts.  Moreover, he must show that the state courts committed the type of error that is actionable under § 2254(d), as that statute has been interpreted by the Supreme Court in *Williams*.

## IV.  DISCUSSION

### A.  Jury Communication Claim (Ground One)

Petitioner first claims that his conviction should be vacated because his federal constitutional rights were violated during the jury deliberation stage of his criminal trial.  He contends that criminal defendants have a constitutional right, under the Fourteenth Amendment's due process clause, to be present whenever the presiding judge communicates with the jury during the deliberation process.  He further contends that he was not present, and his constitutional rights were

therefore violated, on four specific occasions when the trial judge communicated with the jury during the deliberation stage of his trial.

On Petitioner's direct appeal, the Minnesota Supreme Court correctly acknowledged that "[a] defendant in a criminal proceeding has a Fourteenth Amendment due process 'right to be present at all critical stages of trial.'" *Martin II*, 723 N.W.2d at 619 (quoting *Ford*, 690 N.W.2d at 712); *see also Kentucky v. Stincer*, 482 U.S. 730, 745 (1987) ("[A] defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure.").  According to the State Supreme Court, if a judge communicates with the jury "on a substantive matter," that should be treated as a critical stage of the trial, at which the defendant has a right to be present.  *Martin II*, 723 N.W.2d at 619.  For present purposes, this Court will assume that a defendant's right to be present during such communications is guaranteed by the federal Constitution.[10]

However, the Minnesota Supreme Court also correctly recognized "that

_____

[10]    It should be noted that this Court is giving Petitioner the benefit of a significant assumption here.  The Minnesota Supreme Court's analysis of Petitioner's "right to be present" claim is based primarily on state case law interpreting a state criminal rule – Minn. R. Crim. P. 26.03, subd. 1(1).  However, the Minnesota Supreme Court has explicitly acknowledged that "the right to be present under the rule is broader than the right to be present under the Federal Constitution."  *State v. Ware*, 498 N.W.2d 454, 457 (Minn. 1993).  Thus, it is by no means certain that a defendant's *federal constitutional* right to be present at critical stages of a trial necessarily extends to all communications between judge and jury.

'[l]ike any constitutional right, the right to be present at trial may be waived by the accused.'" *Id.* (quoting *State v. Cassidy*, 567 N.W.2d 707, 709 (Minn. 1997)); *see also Peretz v. United States*, 501 U.S. 923, 936 (1991) (even "[t]he most basic rights of criminal defendants are . . . subject to waiver").  Moreover, in this case, the Minnesota Supreme Court found that Petitioner *did* waive his right to be present during the judge-jury communications at issue, because he was present in the courtroom, and raised no objection, when his attorney agreed to let the trial judge communicate with the jury outside of his presence.  The State Supreme Court described this agreement as follows:

> In the agreement initiated by the district court, the court also stated that "the only time I would really want you actually here, with [Petitioner] here, is if there's something of real substance that they ask about that I feel I just *** [s]houldn't do alone."  [Petitioner's] counsel replied, "sure" before the court had finished and "that's fine" when the court had finished.  The court then asked, "Is that okay with everybody?"  [Petitioner's] counsel replied, "Fine with me, Judge."  The court's language indicates that the parties understood the court would have broad discretion in determining whether a question fell within the scope of the agreement. [Petitioner] has conceded as much, stating: "This agreement *** gave the judge unchecked discretion to determine what constituted 'something of real substance ***."

*Martin II*, 723 N.W.2d at 618.

Petitioner does not deny that his attorney entered into this agreement, nor does he deny that he was present when the agreement was made.  He claims, however, that he is not bound by the agreement—and thus he did not actually waive his right to be present at judge-jury communications covered by the

19

agreement—because he did not *personally* approve the agreement.  The State Supreme Court rejected this argument, and held that Petitioner effectively waived his right to be present because he implicitly accepted the agreement made by his attorney.  *Id.* at 619 ("[W]e have not required, either in our original opinion in the instant case or in any other opinion, a defendant to explicitly affirm to the district court his personal waiver of his right to be present.").  The issue presented here is whether the Minnesota Supreme Court's ruling is contrary to, or involves an objectively unreasonable application of, clearly established federal constitutional principles prescribed by the United States Supreme Court.

Petitioner has cited no U.S. Supreme Court decision that says criminal defendants must personally and expressly waive the right to be present during all communications between judge and jury.  Therefore, Petitioner has not shown that the Minnesota Supreme Court's resolution of his "right to be present" claim is "contrary to" established federal law for purposes of § 2254(d)(1).

Petitioner has likewise failed to show that the State Court's resolution of his claim involves an unreasonable application of Supreme Court precedents. Federal courts have frequently observed that "[n]ot all constitutional rights must be waived by the defendant personally; only those rights which are *fundamental and inherently personal* to a criminal defendant, such as the right to testify personally, 'can be waived only by the defendant and not by his attorney.'"  *Wells v. Petsock*  941 F.2d 253, 256 (3d Cir. 1991), *cert. denied*, 505 U.S. 1223 (1992)

(citations omitted) (emphasis added).

> As the Eleventh Circuit stated in a comprehensive in banc opinion,
> criminal defendants at trial "possess essentially two categories of
> constitutional rights: those which are waivable by defense counsel
> on the defendant's behalf, and those which are considered
> 'fundamental' and personal to the defendant, waivable only by the
> defendant." *United States v. Teague*, 953 F.2d 1525, 1531 (11th
> Cir.1992) (*in banc) [,cert. denied*, 506 U.S. 842 (1992)].  Included in
> the former category are matters that "primarily involve trial strategy
> and tactics," such as "what evidence should be introduced, what
> stipulations should be made, what objections should be raised, and
> what pre-trial motions should be filed."  *Id.*  Included in the latter
> category of decisions "personal" to the defendant are, for instance,
> the decisions whether to enter a guilty plea, . . . [citation omitted],
> whether to waive a jury trial, . . . [citation omitted], and whether to
> pursue an appeal, . . . [citation omitted].

*Brown v. Artuz*, 124 F.3d 73, 77 (2d Cir. 1997), *cert. denied*, 522 U.S. 1128

(1998); *see also Gonzalez v. United States*, 128 S.Ct. 1765, 1770 (2008) ("Giving

the attorney control of trial management matters is a practical necessity.  'The

adversary process could not function effectively if every tactical decision required

client approval.'") (quoting *Taylor v. Illinois*, 484 U.S. 400, 418 (1988)); *United*

*States v. Joshi*, 896 F.2d 1303, 1307 (11th Cir.) ("myriad tactical decisions made

by defense attorneys throughout the course of their defense implicitly involve the

waiver of constitutional rights but do not necessitate the personal consent of the

defendant"), *cert. denied*, 498 U.S. 986 (1990).

As explained by the Supreme Court:

> What suffices for waiver depends on the nature of the right at issue.
> "[W]hether the defendant must participate personally in the waiver;
> whether certain procedures are required for waiver; and whether the
> defendant's choice must be particularly informed or voluntary, all
> depend on the right at stake." . . .   For certain fundamental rights,

> the defendant must personally make an informed waiver . . . . *For other rights, however, waiver may be effected by action of counsel.* "Although there are basic rights that the attorney cannot waive without the fully informed and publicly acknowledged consent of the client, the lawyer has – and must have – full authority to manage the conduct of the trial." . . . As to many decisions pertaining to the conduct of the trial, the defendant is deemed bound by the acts of his lawyer-agent and is considered to have "notice of all facts, notice of which can be charged upon the attorney." . . . Thus, decisions by counsel are generally given effect as to what arguments to pursue, . . . what evidentiary objections to raise, . . . and what agreements to conclude regarding the admission of evidence . . . . Absent a demonstration of ineffectiveness, counsel's word on such matters is the last.

*New York v. Hill*, 528 U.S. 110, 114-15 (2000) (citations omitted) (emphasis added).

In Petitioner's case, the Minnesota Supreme Court determined that a criminal defendant need not "explicitly affirm to the district court his personal waiver of his right to be present" during judge-jury communications. *Martin II*, 723 N.W.2d at 619. In essence, the State Court concluded that waiving the right to be present during judge-jury communications is *not* one of those few purely personal decisions—like pleading guilty or waiving a jury trial—that must ultimately be made, and publicly declared, by the defendant alone. This conclusion is not an objectively unreasonable application of any existing United States Supreme Court decision.

It is conceivable, perhaps, that a communication between a judge and a jury could, under some set of circumstances, have some effect on the outcome of a case (although there is no reason to suspect that might have happened here).

That does not mean, however, that the right to be present during judge-jury communications cannot be waived by a defendant's attorney.  Petitioner has not identified any decision by the United States Supreme Court (or any other Court), that suggests that the right to be present during judge-jury communications is the type of fundamental personal right that can be waived *only* by an express declaration made by the defendant himself.  Therefore, this Court cannot conclude that the Minnesota Supreme Court misapplied clearly established federal constitutional principles by ruling that Petitioner's counsel effectively waived Petitioner's right to be present for judge-jury communications that did not involve "something of real substance."

Finally, this Court notes that the State Court's resolution of Petitioner's first claim for relief involved not only an issue of law, but also an issue of fact.  The issue of law was whether the waiver agreement entered into by Petitioner's counsel effectively waived Petitioner's right to be present during judge-jury communications, unless there was an issue that the trial judge found to be "something of real substance."  The issue of fact was whether any of the judge-jury communications actually involved "something of real substance," to which the waiver agreement did not apply.  On this *factual* issue, the Minnesota Supreme Court found that none of the judge-jury communications at issue fell outside of the scope of the waiver agreement.  *Martin II*, 723 N.W.2d at 622-26. This factual determination is presumed to be correct, and cannot be overturned

in the current federal habeas proceeding, unless rebutted by "clear and convincing evidence."  28 U.S.C. § 2254(e)(1).  Petitioner has presented no such evidence here.

The resolution of Petitioner's first habeas corpus claim can be summarized as follows:  Petitioner's attorney entered into an agreement that waived Petitioner's right to be present during judge-jury communications that did not involve "something of real substance."  The Minnesota Supreme Court concluded that Petitioner was bound by that waiver agreement, even though he did not personally and publicly express his approval of it.  This conclusion is not "contrary to" any decision of the United States Supreme Court, nor does it involve an unreasonable application of clearly established federal constitutional law.  To the contrary, the federal courts have frequently recognized that all but the most personal and fundamental rights can be effectively waived by counsel without the need for an express declaration on the record by the defendant himself.  Petitioner has not cited any federal case law suggesting that the right to be present during judge-jury communications is the type of personal and fundamental right that can be waived only by a personal declaration by the defendant himself.  Lastly, the Minnesota Supreme Court found that none of the judge-jury communications at issue in this case involved matters "of real substance," and Petitioner has not presented any clear and convincing evidence to rebut that factual determination.  Thus, this Court concludes that Petitioner

cannot be granted a writ of habeas corpus on his first claim for relief.

## B.  Dying Declaration Claim (Ground Two)

Petitioner's second habeas corpus claim challenges the admissibility of Precious Franklin's testimony that related the victim's dying declaration, "Jeff and Lennell."[11]  Petitioner contends that the admission of Franklin's hearsay testimony violated his constitutional right to confront his accuser – namely, the victim, Curtis Anthony.

The Minnesota Supreme Court explicitly acknowledged that "[t]he Sixth Amendment to the United States Constitution provides that an accused has the right to be confronted with witnesses."  *Martin I*, 695 N.W.2d at 584.  The State Court also recognized that the United States Supreme Court clarified and reinforced the Sixth Amendment's Confrontation Clause in *Crawford v. Washington*, 541 U.S. 36 (2004).  As explained by the Minnesota Supreme Court:

> In a previous case, *Ohio v. Roberts*, 448 U.S. 56 . . . (1980), the Supreme Court set forth a test for admissibility that admits an out-of-court statement by an unavailable witness if the statement bears "adequate indicia of reliability," defined as either hearsay falling within "a firmly rooted hearsay exception" or bearing "particularized

---

[11]    The Minnesota Supreme Court found that the victim's "Jeff and Lennell" statement was, in fact, a dying declaration, because when the victim uttered those words, he "recognized the severity of his [ultimately mortal] wounds and believed death was imminent."  *Martin I*, 695 N.W.2d at 583.  This factual determination by the State Court is presumed to be correct.  Because Petitioner has presented no evidence to rebut that presumption, the victim's statement must be viewed as a "dying declaration" for federal habeas corpus purposes.

> guarantees of trustworthiness."  *Id.* at 66 . . . . [T]he *Crawford* Court
> determined that the Confrontation Clause of the United States
> Constitution bars admission of *testimonial statements* of witnesses
> who do not appear at trial unless (1) they are unavailable to testify,
> and (2) the defendant has had a prior opportunity to cross-examine
> them . . . . The Court thus announced a new test for the admissibility
> of those statements that are 'testimonial' but left the *Roberts* test in
> place for nontestimonial statements . . . .

*Martin I*, 695 N.W.2d at 584 (citing *Crawford*, 541 U.S. at 59, 53-54, 68)

(emphasis added).

On Petitioner's direct appeal, the State contended that Anthony's dying

declaration was "nontestimonial" and thus admissible under *Roberts*, while

Petitioner contended that the dying declaration at issue was "testimonial" and

thus inadmissible under *Crawford*.  The Minnesota Supreme Court concluded

that it was unnecessary to decide whether Anthony's dying declaration was

"testimonial," (a term not defined by *Crawford*), because "the Sixth Amendment

incorporates an exception for dying declarations and Anthony's dying declaration

was admissible as an exception to the *Crawford* rule."  *Martin I*, 695 N.W.2d at

585.  To succeed here, Petitioner must show that the State Court's conclusion is

contrary to, or involves an unreasonable application of, the apposite decisions of

the United States Supreme Court.  That burden has not been met.

As the Minnesota Supreme Court correctly noted, *Crawford* itself strongly

suggests that dying declarations should be viewed as a special exception to the

Confrontation Clause, because dying declarations were generally admissible at

criminal trials when the Confrontation Clause was added to the Constitution.  The

State Court explained that "the Confrontation Clause 'is most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established at the time of the founding' strongly suggests that because dying declarations were a recognized common-law exception at the time of the founding, there is no inherent conflict in continuing to recognize them today."  *Id.* (quoting *Crawford*, 541 U.S. at 54).

*Crawford* itself did not involve a dying declaration, so the Supreme Court's decision in that case did not explicitly determine whether dying declarations should be treated as a special exception to the general rule prescribed by the Confrontation Clause.  However, the Court pointed out in *Crawford* that "[a]lthough many dying declarations may not be testimonial, there is authority for admitting even those that clearly are."  541 U.S. at 56.  Thus, *Crawford* itself does not undermine the Minnesota Supreme Court's adjudication of Petitioner's Confrontation Clause claim, and, in fact, *Crawford* provides substantial support for the State Court's ruling.

The Supreme Court's subsequent decision in *Giles v. California*, 128 S.Ct. 2678 (2008), provides even more support for the State Court's ruling on Petitioner's Sixth Amendment claim.  In *Giles*, the Court reiterated that the Confrontation Clause is subject to "exceptions established at the time of the founding."  *Id.* at 2682.  The Court also indicated, as it had in *Crawford*, that dying declarations are one of the "forms of testimonial statements [that] were

admitted at common law even though they were unconfronted." *Id.*  *Giles* did not

actually hold that dying declarations are an exception to the Confrontation

Clause, but the Court said as much in unusually explicit dicta.  In light of *Giles*,

this Court could not possibly conclude that the State Court's resolution of

Petitioner's Confrontation Clause claim is contrary to, or an unreasonable

application of, the recent apposite opinions of the United States Supreme Court.

Petitioner seems to be asking this Court to ignore what the Supreme Court

has said about the longstanding (pre-Constitution) admissibility of dying

declarations, and the reason for why dying declarations should therefore be

admissible as an exception to the rules prescribed by *Crawford*.  He argues that:

> The misconception that dying declarations are inherently and
> obviously reliable is the foundation of the "historical grounds"
> *Crawford* noted.  Therefore this court must correct this myth of
> reliability and discontinue following bad law simply because it is
> firmly rooted.

(Doc. No. 17, Pet'rs Mem. in Supp. of Pet. for Habeas Corpus ("Pet'rs

Mem.") 15.)  Needless to say, this Court is not authorized to "correct" a "myth"

endorsed by the United States Supreme Court, nor does this Court have the

option to "discontinue following" allegedly "bad law" that is "firmly rooted" in

Supreme Court decisions.  This Court is bound to follow (not "correct") *Crawford*

and *Giles*.  In light of what the Supreme Court has written in those two cases, it

cannot be said that the Minnesota Supreme Court's adjudication of Petitioner's

Sixth Amendment claim is contrary to, or involves an unreasonable application

of, apposite U.S. Supreme Court precedents.  Indeed, the State Court's decision

is fully consistent with the teachings of *Crawford* and *Giles*.[12]

### C.  Police Misconduct Claim (Ground Three)

Ground Three of the current petition actually consists of three separate

claims: (1) the police failed to preserve certain potentially exculpatory evidence –

namely, an officer's uniform that was stained by the victim's blood; (2) the police

did not adequately protect the crime scene and sequester potential witnesses

from communicating with other people; and (3) the police used an "unfair and

bias[ed]" photo lineup to help identify Petitioner.  All three of these claims were

raised in Petitioner's *pro se* brief to the Minnesota Supreme Court in *Martin I*, and

all three claims were summarily rejected on direct appeal.  *Martin I*, 695 N.W.2d

at 587.

Although the State Supreme Court did not furnish an extensive written

analysis of Petitioner's police misconduct claims, it is clear that the Court denied

those claims on the merits.  *Id.* ("We have reviewed each of [Petitioner's] *pro se*

---

[12]    It is also worth noting that Petitioner's accomplice, Jeffrey Young, filed a
habeas corpus petition in this District, which raised the same Confrontation
Clause claim that Petitioner is raising here.  In Young's case, *Young v. Symmes*,
No. 06-4246 (JRT/JJG), 2008 WL 4748569 (D. Minn Oct. 28, 2008), the District
Court pointed out that the "the Supreme Court has strongly hinted that dying
declarations are admissible as an exception to the right of confrontation that
existed prior to the adoption of the Sixth Amendment."  *Id.* at *3, n.1.  This led the
Court to conclude in Young's case that the admission of Anthony's dying
declaration did not violate the federal Constitution.  This Court reaches the same
conclusion here.

claims and find them to be without merit . . .").  Therefore, the State Court's

decision on those claims is entitled to the full measure of deference prescribed

by AEDPA.   *See James v. Bowersox*, 187 F.3d 866, 869 (8th Cir. 1999) ("The

summary nature of the [state court] opinion does not affect th[e] standard of

review."), *cert. denied*, 528 U.S. 1143 (2000).  Under AEDPA:

> where the state court has not articulated its reasoning, federal courts
> are obligated to conduct an independent review of the record and
> applicable law to determine whether the state court decision is
> contrary to federal law, unreasonably applies clearly established law,
> or is based on an unreasonable determination of the facts in light of
> the evidence presented . . . . [Citations omitted.]  That independent
> review, however, is not a full, *de novo* review of the claims, but
> remains deferential because the court cannot grant relief unless the
> state court's result is not in keeping with the strictures of the AEDPA.

*Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000), *cert. denied*, 532 U.S. 947

(2001).[13]

Thus, this Court must conduct an independent review of the three claims

presented at Ground Three of the current petition, but the Court must also

maintain the highly deferential perspective prescribed by AEDPA.

### (i) Failure to preserve bloody clothing

Petitioner contends that his constitutional rights were violated, and his

conviction should be vacated, because the police did not preserve the blood-

---

[13]     The standard of review prescribed by the Sixth Circuit in *Harris* has been
approved by numerous federal courts, including the Eighth Circuit Court of
Appeals in *Niederstadt v. Nixon*, 465 F.3d 843, 846 (8th Cir.), *rehearing en banc
granted, opinion vacated on other grounds*, (Dec. 13, 2006).

stained clothing of a police officer who tried to care for Curtis Anthony as he was bleeding to death.  Petitioner believes that the clothing might have provided evidence favorable to his defense, such as, perhaps, some blood from Anthony's assailants.

The Supreme Court has held that the Fourteenth Amendment's due process clause does not "impos[e] on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution." *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988).  "A 'state's failure to preserve evidence does not constitute a denial of due process unless the state acted in bad faith, the evidence had apparent exculpatory value and comparable exculpatory evidence was not reasonably available to the defendant.'" *Boykin v. Leapley*, 28 F.3d 788, 793 (1994) (quoting *United States v. Malbrough*, 922 F.2d 458, 463 (8th Cir.1990), *cert. denied*, 501 U.S. 1258 (1991)).  If there is "no suggestion of bad faith on the part of the police . . . there was no violation of the Due Process Clause." *Youngblood*, 488 U.S. at 58.

In this case, it might be argued that the police should have saved the bloody clothes of the officer who was attending to the victim, but Petitioner has offered no reason to believe that those clothes were deliberately destroyed in order to deprive Petitioner of exculpatory evidence.  Petitioner has not shown any reason to think that anyone associated with the prosecution acted in "bad faith"

or with any improper motive.  Furthermore, there is nothing to suggest that the bloody clothing actually would have yielded any exculpatory evidence.  *See Boykin*, 28 F.3d at 793 (stating that because habeas petitioner "cannot show any prejudice to him from the state's failure to preserve evidence, we find no deprivation of his constitutional right to due process").  Indeed, given the overwhelming evidence that Petitioner and Jeff Young were the killers, there is good reason to suspect that any relevant evidence obtained from the officer's clothing would have been incriminating, rather than exculpatory.

Because Petitioner has not provided any specific credible evidence of "bad faith" by law enforcement officials, and he has not shown that the evidence at issue was likely to be exculpatory, his "failure to preserve evidence" claim must be rejected.

### (ii) Failure to preserve the crime scene

Petitioner next argues that law enforcement officials violated his constitutional rights by "[f]ailing to preserve and protect the crime scene and its evidence, [and] by allowing undetected movement of individuals, in and out of the crime scene during the most critical moments of the investigation."  (Pet'rs Mem. 36.)  Petitioner argues that potentially exculpatory physical evidence, such as fingerprints, DNA, or fibers, could have been damaged or destroyed because the police did not follow proper protocols for preserving the crime scene.  He also argues that witnesses may have been corrupted by outside influences before

their untainted recollections could be accurately recorded.

Petitioner apparently believes that police officers have a constitutional duty to follow certain standard procedures and protocols when conducting criminal investigations.  However, he has not cited any Supreme Court cases, or any other legal authority, to support that proposition.  It could, perhaps, be argued that the "bad faith" rule that applies to the preservation of evidence in general (as discussed above), should also apply to the preservation of a crime scene.  But that argument, if accepted, could not help Petitioner here, because he has not shown any bad faith by any police officers.  Petitioner could contend (as his counsel apparently did at trial), that the police were careless, and made mistakes, during the investigation of Anthony's murder.[14]  However, he has not shown that any such carelessness or mistakes were attributable to bad faith.

Furthermore, Petitioner has offered no reason to believe that the police actually would have discovered any evidence favorable to his defense if the crime scene had been better preserved.  The supposed harm from the alleged police errors, including the purported corruption of witness testimony, is merely hypothetical speculation.  Petitioner has not shown any actual, demonstrable

---

[14]   Petitioner could have tried to convince the jury that the prosecution's witnesses had been corrupted before or during the police investigation, and that those witnesses were therefore unreliable.  The jury then could have decided whether any witness's testimony should be rejected or discounted.  In fact, it appears that Petitioner may have tried to present such arguments, but they simply were not accepted.  That does not mean, however, that Petitioner's constitutional rights were violated.

prejudice that is directly traceable to the alleged failure to preserve the crime scene.  For this additional reason (as well as the failure to show bad faith), the Court must reject Petitioner's due process claim for failure to properly preserve the crime scene.

### (iii) Photo lineup

Petitioner also argues that he was denied due process because the photo lineup procedure, by which he was identified by Precious Franklin, was unfair. He contends that the police assisted Franklin during the photo lineup, by telling her that "Suspect #2" (presumably meaning Jeff Young), was not included in the photos being shown to her.  (Pet'rs Mem. 39.)

The United States Supreme Court has established a two-step test for determining whether a criminal defendant has been denied due process by reason of an improper out-of-court identification procedure.  *Neil v. Biggers*, 409 U.S. 188, 198-99 (1972); *see also Griffin v. Delo*, 33 F.3d 895, 909 (8th Cir. 1994), *cert. denied*, 514 U.S. 1119 (1995); *Graham v. Solem*, 728 F.2d 1533, 1541 (8th Cir.) (*en banc), cert. denied*, 469 U.S. 842 (1984).  The reviewing court must first determine whether the procedure was, in fact, "impermissibly suggestive."  *Graham*, 728 F.2d at 1541.[15]  If so, the court must then determine

---

[15]    An identification procedure is "impermissibly suggestive" if it tends to focus the witness's attention on the accused.  For example, a procedure may be impermissibly suggestive if a witness is initially exposed to an accused by viewing his photograph alone (rather than as part of a lineup), or by a one-person "show-up."  *United States v. Patterson*, 20 F.3d 801, 806 (8th Cir.), *cert. denied*,
(Footnote Continued on Next Page)

whether the procedure "created a very substantial likelihood of irreparable
misidentification." *Id.*[16]  Even if a particular identification procedure is found to be
impermissibly suggestive, habeas corpus relief will not be granted unless the
petitioner also demonstrates that the procedure created a substantial likelihood
of misidentification.

The reliability of a particular out-of-court identification procedure is a
factual issue. *Mack v. Caspari*, 92 F.3d 637, 642 (8th Cir. 1996), *cert. denied*,
520 U.S. 1109 (1997); *Griffin*, 33 F.3d at 909; *Trevino*, 2 F.3d at 833 ("[T]he
evaluation of the *Biggers* factors [is] a factual determination.").  Therefore, in a
federal habeas action, a state court's determination that a particular identification
procedure was reliable is presumed to be correct, unless the petitioner has
presented clear and convincing evidence to rebut the presumption.  28 U.S.C.
§ 2254(e)(1).

In this case, the Minnesota Supreme Court rejected Petitioner's photo

---

(Footnote Continued from Previous Page)
513 U.S. 845 (1994).  An identification procedure might also be impermissibly
suggestive if the accused was wearing handcuffs when first identified by a
witness.  *Trevino v. Dahm*, 2 F.3d 829, 833-34 (8th Cir. 1993).

[16]     The Supreme Court has suggested several factors that should be
considered when assessing the likelihood of misidentification.  These factors
include (i) the nature and extent of the witness's opportunity to observe the
accused, (ii) the witness's attention to the appearance of the accused, (iii) the
accuracy and completeness of the witness's prior description of the accused,
(iv) the witness's level of certainty when identifying the accused, and (v) the
length of time between the crime and the identification procedure.  *Biggers*, 409
U.S. at 199-200; *Manson v. Brathwaite*, 432 U.S. 98, 114-16 (1977).

lineup claim without comment.  *Martin I*, 695 N.W.2d at 587.  The Court

presumably determined that the photo lineup procedure used in Petitioner's case

was not impermissibly suggestive, and/or not likely to cause a misidentification.

Petitioner has not presented clear and convincing evidence to rebut the

presumptive correctness of that determination.  Assuming that the police did tell

Precious Franklin that "Suspect # 2" was not in the photo lineup, Petitioner has

not shown how that information alone would have induced Franklin to pick him

out of the lineup.

In sum, Petitioner has not adequately demonstrated that the photo lineup

procedure used in this case was either "impermissibly suggestive," or that it

created a substantial likelihood of misidentification.  Therefore, he has not shown

that his photo lineup claim was wrongly rejected by the Minnesota Supreme

Court.

### D.  Prosecutorial Misconduct Claim (Ground Four)

In Ground Four of the current petition, Petitioner claims that he was

deprived of his constitutional right to due process because of prosecutorial

misconduct.  Petitioner contends that the prosecutor committed misconduct by

(1) bringing new criminal charges against him by means of a criminal complaint

filed after the grand jury's indictment; (2) suggesting to the jury that Petitioner

and his family had tried to impede the investigation of Curtis Anthony's murder;

and (3) distorting and misrepresenting the physical evidence introduced during

Petitioner's trial.  None of these arguments is sustainable.[17]

### (i) Use of criminal complaint to bring additional charges

Petitioner initially accuses the prosecutor of improperly supplementing the charges against him by filing a criminal complaint that added new charges not included in the grand jury's previous indictment.  He contends that the prosecution is not allowed to "issue a complaint and add on charges that the Grand Jury never even considered, and without the Grand Jury ruling on the issue of probable cause."  (Pet'rs Mem. 20.)  This argument plainly has no merit.

The Supreme Court has held that a guilty verdict effectively invalidates any post-verdict challenge to the propriety of the charging process, because "the petit jury's verdict of guilty beyond a reasonable doubt demonstrates *a fortiori* that there was probable cause to charge the defendants with the offenses for which they were convicted."  *United States v. Mechanik*, 475 U.S. 66, 70 (1986).  In other words, "[a]ny injury sustained in the charging process is cured by a subsequent finding of guilt beyond a reasonable doubt." *United States v. Tulk*, 171 F.3d 596, 598 (8th Cir. 1999).

Furthermore, the federal Constitution does not require states to conduct any grand jury proceedings at all.  *Cooksey v. Delo*, 94 F.3d 1214, 1217 (8th Cir.

---

[17]    Petitioner's prosecutorial misconduct claims, like his police misconduct claims, were summarily dismissed by the State Supreme Court without discussion.  *Martin I*, 695 N.W.2d at 587.  Therefore, the review of Petitioner's prosecutorial misconduct claims is governed by the same standard applied to his police misconduct claims.  *See supra* p. 30.

1996) (citing *Hurtado v. California*, 110 U.S. 516 (1884)), *cert. denied*, 522 U.S. 1027 (1997).  Therefore, Petitioner's constitutional rights could not have been violated by the alleged lack of a grand jury indictment for some of the charges against him.  For this additional reason, Petitioner's first prosecutorial misconduct claim is clearly unsustainable.

### (ii) Insinuation that Petitioner and his witnesses were evasive

Petitioner next contends that he was deprived of his constitutional right to a fair trial because of certain remarks made by the prosecutor during the trial. Petitioner alleges that the prosecutor tried to "inflame the passions and prejudice of the jury," by suggesting that he and his mother had hampered the police investigation of Anthony's murder by failing to cooperate.  (Pet'rs Mem. 34.)

Even if the remarks cited by Petitioner were somehow improper (a premise that is accepted only for the sake of discussion), he would not be entitled to habeas corpus relief, unless he could show that those remarks were "so egregious that they fatally infected the proceedings and rendered [the Petitioner's] entire trial fundamentally unfair."  *Moore v. Wyrick*, 760 F.2d 884, 886 (8th Cir. 1985); *see also Roberts v. Bowersox*, 137 F.3d 1062, 1066 (8th Cir. 1998) (prosecutorial misconduct does not merit habeas corpus relief unless the prosecutor committed an error that effectively eliminated the defendant's due process right to a fair trial) (citing *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)), *cert. denied*, 525 U.S. 1073 (1999).

"'[I]t is not enough that the prosecutors' remarks were undesirable or even universally condemned . . . . Rather, the 'relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Mack*, 92 F.3d at 643 (quoting *Darden*, 477 U.S. at 181).  "Under this standard, a petitioner must show that there is a reasonable probability that the error complained of affected the outcome of the trial -- i.e., that absent the alleged impropriety, the verdict probably would have been different.'"  *Mack*, 92 F.3d at 643 (quoting *Jones v. Jones*, 938 F.2d 838, 844-45 (8th Cir. 1991)); *see also Clemons v. Luebbers*, 381 F.3d 744, 750 (8th Cir. 2004) ("Relief is available only if 'the prosecutor's closing argument was so inflammatory and so outrageous that any reasonable trial judge would have *sua sponte* declared a mistrial.'") (quoting *James*, 187 F.3d at 869), *cert. denied*, 546 U.S. 828 (2005).  Needless to say, this is an extremely difficult burden to sustain.

In this case, this Court cannot conclude that the remarks cited by Petitioner were so outrageous or inflammatory that he probably was deprived of his constitutional right to a fair trial.  The prosecutor apparently did try to suggest that Petitioner and his family had not cooperated with the police, and the prosecutor presumably did want the jury to infer that Petitioner and his family had something to hide (namely, Petitioner's involvement in Anthony's murder).  However, the Court questions whether the prosecutor acted improperly by trying to convince

the jury that Petitioner and his family had been evasive.  More importantly, for

present purposes, Petitioner has not described anything that the prosecutor

actually said or did that was so outrageous that it effectively deprived Petitioner

of a fair trial, and warrants a writ of habeas corpus.  Given the overwhelming

evidence of Petitioner's guilt, the Court cannot conclude that the jury's verdict in

this case probably would have been different if not for the prosecutor's rather

innocuous insinuation that Petitioner and his family did not cooperate with the

police.

### (iii) Misleading the jury about the relevance of the physical evidence

Petitioner also accuses the prosecutor of trying to mislead the jury about

the significance of certain DNA and fingerprint evidence.  The DNA evidence

cited by Petitioner was obtained from a cigarette butt that was found at the

murder scene.  Petitioner contends that the cigarette at issue was not the brand

smoked by the victim, which suggests that it might have been brought to the

murder scene by one of the victim's assailants.  Petitioner explains that the DNA

evidence obtained from the cigarette butt did *not* come from either him or his

accomplice, so this evidence lent support to his argument that someone else

committed the crime.  In short, the DNA evidence apparently was exculpatory.

Yet, according to Petitioner, the prosecutor's "mere mention" of this DNA

evidence deprived him of a fair trial.  (Pet'rs Mem. 22.)  He claims that "the

Prosecutor was well aware of the negative impact and the psychological effect"

of the DNA evidence, and that the prosecutor used "tricky and misleading language" to fool the jury into thinking that the exculpatory DNA evidence actually was incriminating.  (*Id.*)  This argument warrants no extended discussion.  This Court could not possibly conclude that Petitioner was denied a fair trial based solely on the prosecutor's "mere mention" of DNA evidence that actually helped Petitioner's defense.

Petitioner's argument with regard to the fingerprint evidence is equally untenable.  Petitioner contends that even though the prosecutor conceded his fingerprints were *not* found at the crime scene, the prosecutor nevertheless misused the fingerprint evidence, by pointing out the obvious fact that Petitioner could have committed the crime without leaving any discoverable fingerprint evidence.  (*Id.* at 24.)  The prosecutor also pointed out to the jury that a fingerprint of Petitioner's alleged accomplice, Jeff Young, was found on the alleged getaway car.  Petitioner has not adequately explained why he thinks these comments about the fingerprint evidence were improper.  He certainly has not shown that these comments were so outrageous that they deprived him of a fair trial.

Given the relatively inoffensive nature of the remarks cited by Petitioner, together with the substantial weight of the incriminating evidence against him, the Court cannot conclude that Petitioner is entitled to a writ of habeas corpus based on prosecutorial misconduct.  Therefore, Ground Four of the current petition must

also be denied.

## V.  RECOMMENDATION

Based on the foregoing, and all the files, records and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1.  Petitioner's application for habeas corpus relief under 28 U.S.C. § 2254

(Doc. No. 1), be **DENIED**; and

2.  This action be **DISMISSED WITH PREJUDICE**.


Dated:   January 9, 2009


_s/ Jeffrey J. Keyes_____
JEFFREY J. KEYES
United States Magistrate Judge


Under D.Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **January 23, 2009**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within ten days after service thereof.  All briefs filed under this rule shall be limited to 3500 words.  A judge shall make a de novo determination of those portions of the Report to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.